BRAYTON IVES, Appellant, v. GILBERT I. ELLIS et al., Respondents.

EVIDENCE — WHEN ERROR IN RECEIVING LETTER INCOMPETENT AS HEARSAY IS NOT CURED. Where the issues in an action are as to whether there was an express warranty that a certain book was a genuine printed copy of an ancient document typographically produced from movable types, and if so as to whether there was a breach, a letter written to defendants by an expert stating that in his opinion the book in question was a genuine piece of ancient typography, and that the same opinion was held by another competent judge of early printing, is incompetent as hearsay, and its admission in evidence for any purpose is error; and where from an examination of the proceedings upon the trial subsequent to its introduction it must be held that the error was not cured, it constitutes reversible error.

*Ives* v. *Ellis*, 50 App. Div. 399, reversed.

(Argued October 25, 1901; decided December 17, 1901.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered April 26, 1900, affirming a judgment in favor of defendants entered upon a verdict and an order denying a motion for a new trial.

The nature of the action and the facts, so far as material, are stated in the opinions.

*Charles E. Hughes* and *Arthur C. Rounds* for appellant. The defendants were not entitled to judgment as matter of law. The issues as to the warranty and its breach were determinable by the jury, and the plaintiff's exceptions are fatal to the judgment. (*Ashworth* v. *Wells*, 78 L. T. Rep. 136;

77 L. T. Rep. 691; *Woodbury* v. *Robbins,* 10 Cush. 520;
*Waeber* v. *Talbot,* 167 N. Y. 48; *Rust* v. *Eckler,* 41 N. Y.
494; *Brigg* v. *Hilton,* 99 N. Y. 517; *Reed* v. *Randall,* 29
N. Y. 358; *Dounce* v. *Dow,* 64 N. Y. 411; *C. I. Co.* v. *Pope,*
108 N. Y. 232; *Hawkins* v. *Pemberton,* 51 N. Y. 198.) The
trial court erred in admitting the letter written by F. S. Ellis
to Ellis & Elvey under date of June 30, 1891. (*Erben* v.
*Lorillard,* 19 N. Y. 302; *Coleman* v. *People,* 58 N. Y. 561;
*Newman* v. *Ernst,* 31 N. Y. S. R. 1.) The trial court erred
in permitting defendants' counsel to read extracts from books
in the course of his cross-examination. (*Foggett* v. *Fischer,*
23 App. Div. 207; *Matter of Mason,* 60 Hun, 57; *Harris*
v. *P. R. R. Co.,* 3 Bosw. 317; *Lilly* v. *Parkinson,* 91 Cal.
655; *Boyle* v. *State,* 57 Wis. 478; *Whiton* v. *Albany Co.,*
109 Mass. 31; *Commonwealth Co.* v. *Sturtevant,* 117 Mass.
122; *Tucker* v. *Donald,* 60 Miss. 460; *State* v. *O'Brien,* 7
R. I. 336; *Davis* v. *State,* 38 Md. 36.)

*Austen G. Fox* and *James H. Fay* for respondents. If
there was no warranty, plainly the court is not concerned
with questions of evidence which relate only to the genuine-
ness of the book, and that the plaintiff failed to establish a
warranty, which was intended to survive acceptance, is clear
beyond reasonable doubt. (*Brigg* v. *Hilton,* 99 N. Y. 517;
*Zabriskie* v. *C. V. R. R. Co.,* 131 N. Y. 72; *Carleton* v. *L.
A. & Co.,* 149 N. Y. 137; *Jendwine* v. *Slade,* 2 Esp. 572;
*Power* v. *Barham,* 4 Ad. & El. 473; *Schuyler* v. *Russ,* 2
Cai. Rep. 202; *Studer* v. *Bleistein,* 115 N. Y. 316; *Day* v.
*Pool,* 52 N. Y. 416; Benj. on Sales [7th ed.], 664; *McFar-
land* v. *Newman,* 9 Watts, 55.) There was no good ground
for excluding any part of the correspondence. (*Plumb* v.
*Curtis,* 66 Conn. 154; *People* v. *Shea,* 147 N. Y. 78; *Clarke*
v. *Westcott,* 2 App. Div. 503; 158 N. Y. 736; *Shippen* v.
*Bowen,* 122 U. S. 575; *Titus* v. *Poole,* 145 N. Y. 414.) The
court committed no error in exercising its discretion as to the
extent to which cross-examination of experts should be allowed.
(*C. M. L. Ins. Co.* v. *Ellis,* 89 Ill. 516; *Pinney* v. *Cahill,*

48 Mich. 584; *Railway Company* v. *Howell*, 147 Ind. 274; *Byers* v. *Railway Co.*, 94 Tenn. 345; *Egan* v. *D. D., E. B. & B. R. R. Co.*, 12 App. Div. 556.)

PARKER, Ch. J.   That the letter of Mr. F. S. Ellis to Ellis and Elvey, introduced in evidence by the defendants, was hearsay and incompetent, is too clear to admit of debate.   But it is urged that this error on the part of the trial court should not lead to a reversal, because (a) it was so slight an error that it should be overlooked; (b) the court should be deemed to have cured the error by its instructions to the jury; (c) it bore only upon the issue, whether there was a breach of warranty, and as no express warranty was proved no harm could have resulted; (d) if there was evidence tending to prove an express warranty, the verdict, being general in favor of the defendants, imported that no contract of warranty existed, which, being unanimously affirmed, renders immaterial the erroneous rulings relating to evidence bearing only on the question of breach of contract.

A brief examination of the record will show that these excuses for affirming the judgment, notwithstanding the error of the trial court, are not well grounded.   The plaintiff's claim is that on or about the 20th of March, 1890, the defendants, a firm of booksellers doing business in London, sold to him a certain document, purporting to be a copy of a letter in the Spanish language written by Christopher Columbus on his return from his first voyage, announcing his discovery of the new world, addressed to Luis de Sant Angel, which document these sellers represented and expressly warranted to the plaintiff to be a printed copy, typographically produced from movable types, and that believing such representations to be true, and relying upon such express warranty, the plaintiff purchased such document and paid therefor the sum of nine hundred pounds sterling; but that such representation or war_ ranty was not true, inasmuch as the document was not a printed copy produced typographically by means of movable types, but had been produced in some other way, so as to con-

stitute a counterfeit of a printed book typographically pro-
duced. The defendants denied having made an express war-
ranty concerning the document or the process by which it was
produced. Upon this issue evidence was given by both the
plaintiff and the defendants, as well as upon the further issue
whether there was a breach of the warranty, if one was made.
As to the latter question the plaintiff called several experts,
who testified that in their opinion the document was not pro-
duced by typography, while the defendant Ellis and one
expert produced by him expressed a contrary opinion. The
defendants offered in evidence a letter, addressed to them by
Mr. F. S. Ellis, reading as follows:

"THE RED HOUSE, CHELSTON, TORQUAY, *June 30th*, 1891.

"DEAR SIRS.—In reply to your inquiry respecting the
Columbus letter in Spanish, now (or lately) in the possession
of Mr. Brayton Ives, I can only say that after a very careful
examination of the document, and after weighing all the argu-
ments that could be adduced on the other side, I came most
decidedly to the conclusion that it was a genuine piece of
ancient typography belonging to the latter end of the fifteenth
century. This was also the opinion of the late Mr. Blades,
the author of the Life of Caxton, than whom I believe it
would be difficult to name a more competent judge of early
printing. Allow me to remark that I looked at the work in
question without any bias in favor of its being genuine, and that
I never had the smallest pecuniary interest in it in any way.

"I am, dear sirs, yours faithfully,

"F. S. ELLIS."

This letter was written more than fifteen months after Mr.
Ives had purchased the document of the defendants, and con-
tained, as appears from its reading, the opinion of Mr. F. S.
Ellis that the document was a genuine piece of ancient typog-
raphy; and it also purported to contain the opinion of the
late Mr. Blades to the same effect, for whom Mr. Ellis vouched
as a most competent judge of early printing. The letter was
most persuasive with the jury, as to the opinion expressed,

because of the testimony of Mr. Ives, already given, to the effect that he had had extensive dealings with Mr. Ellis and regarded his opinion on that subject highly, and who, desiring to prepare himself against hostile criticism, had written to the defendants asking them if they could procure letters supporting the book from Mr. Major of the British Museum and from Mr. F. S. Ellis. The plaintiff's counsel, appreciating the injury that would result to his client by the admission of this letter, obtained at a time when he believed the document to be genuine, and for the purpose of supporting the claim of genuineness that he had made when he was about to offer this with other books for sale to the public, promptly objected that the letter was hearsay and incompetent, which objection he supported by argument at length, in the course of which he said : " My objection to the letter is upon the ground that it is written fifteen months after the transaction in question, and is not germane to the inquiry here as to whether the warranty was given or whether it was broken. The transmission of this letter to Mr. Ives at Mr. Ives' request, to be fortified with regard to the truth of the statement which Mr. Gilbert Ellis had made, has nothing to do with the question as to what statement Mr. Gilbert Ellis had made, or whether that statement was true in fact. The real object, I submit, is to get before the jury evidence upon the question of typography without examining the witness." After further argument the following took place : " The Court : Now, let me understand, Mr. Fox, what limitations you admit with reference to the introduction of this letter ? Mr. Fox : Will your Honor pardon me if I ask you what limitations you desire to impose upon it ? The Court : That it is not proof of any of the statements therein contained. Mr. Fox : So I admit. The Court : And that it is merely introduced as showing a letter received by the plaintiff in pursuance of a request made to the defendants by him ? Mr. Fox : Yes. The Court : And that is the only fact established by it ? Mr. Fox : That is it. The Court : Admitted with that limitation. Mr. Hughes : Exception. Offered in evidence and marked exhibit 1 of

this date." It is difficult to discover any reason for its admission with the limitation imposed by the court and assented to by counsel. But having received it, not as proof of any of the statements therein contained, but merely as showing a letter received, the court nevertheless permitted the defendants, against the objection and exception of plaintiff's counsel, to read the letter to the jury, saying: "Any paper that appears in evidence can be read." It is true that the court said before the letter was read: "I shall instruct the jury that the letter and statements in the letter do not in any wise prove the statements therein contained or any of them." But such a statement necessarily could not have had the effect of persuading the jury that they were not to attach any importance whatever to the opinion expressed in the letter, in the light of the decision of the court that the letter should be read to them notwithstanding the protest of counsel. The jury must necessarily have reached the conclusion that for some reason the court deemed it important that they should be possessed of the opinions of Mr. Ellis and Mr. Blades upon this feature of the controversy. For an appellate court to sustain a ruling admitting incompetent, but, to lay minds, persuasive evidence, because before its reading the court states that the evidence does not in any wise prove the statements therein contained, would not only be unprecedented, but would be mischievous in its tendency, in that it would seem to point out a method by which ingenious counsel could get before a jury incompetent evidence without danger of subsequent reversal for the error of admitting it. Now, this letter was mere hearsay of the most objectionable character, and yet through it the jury, by permission of the court, had before them a concise and positive statement of Mr. F. S. Ellis that after a careful examination he was most decidedly of the opinion that the work was a genuine piece of ancient typography, and that Mr. Blades agreed with him, and no alleged limitation upon the introduction of the letter could drive out of their minds the impression necessarily received therefrom.

We now come to the claim that it was subsequently cured by the trial court, which, in the course of its charge, said: "I desire particularly to caution you to disregard entirely in your deliberations the contents of the letter written by Mr. Ellis to Mr. Ives in response to the latter's inquiry. That letter was admitted solely for the purpose of proving its receipt by Mr. Ives and not to bring before you any of the matters therein contained." Undoubtedly the court intended to cure the error that it had committed, but the question is, was the error cured? not, what was the intention of the court. If it had stricken the letter from the evidence and directed the jury to disregard it, or had so accurately described the letter that there could be no mistake in the jurors' minds but that they were commanded to disregard the opinions of Mr. F. S. Ellis and Mr. Blades, then under the authorities it would be our duty to say that the error was in effect cured. (*Holmes* v. *Moffat*, 120 N. Y. 159; *People* v. *Schooley*, 149 N. Y. 99.) In the latter case the court first struck the evidence from the record and then directed the jury to disregard it, while in the former the court said: "I withdraw it from your consideration, as I do not believe it to be proper or material evidence. * * * I do not think my attention was directed to it with that degree of care that it should have been; and, therefore, it got in. I think it my duty to say to you that that particular portion of the answer * * * is not before you as evidence at all." But before an appellate court will hold that such an error has been cured, it must feel sure that the effort of the trial court to correct the error was necessarily effective with the minds of the jury. Now, that cannot be said of the caution of the court in this instance, for it must be borne in mind that this letter was introduced in the early part of the trial, which was not only a long one, but in its progress there was an adjournment for a period of ten days, during which the jurors presumably had their minds occupied with affairs of their own; and in view of that situation it was necessary that the court should so accurately describe the letter which it wished them to disregard as to make it apparent that there

could be no confusion in their minds as to what letter was
referred to. Now the letter in question was not written by
Mr. Ellis to Mr. Ives, as the instructions to the jury assume,
but instead was written by Mr. F. S. Ellis to Messrs. Ellis and
Elvey, these defendants, and by them subsequently sent to the
plaintiff. And inasmuch as the fact of correspondence between
Ives and Ellis and Elvey was frequently referred to during the
progress of the trial, it is not unlikely that they may have been
in doubt whether the letter referred to in the charge was the
letter which was the occasion of considerable controversy many
days before. But whatever the fact may be, the court should
not declare an error committed under such circumstances as
those disclosed by this record, cured, unless the directions of the
court to disregard the particular letter applies to it in explicit
terms, which was not done in this case, for the jury was
not told to disregard the letter written by Mr. F. S. Ellis
to Ellis and Elvey. Indeed, the method adopted in this case
of saying that the jury should not regard the letter as proof
of any fact, and in the next breath commanding that it should
be read to them, probably put it beyond the power of the
court to do away with the mischief accomplished, except by
frankly admitting to the jury that the court had erred in
directing it to be read in their hearing and at the same time
instructing them to disregard it. For without such an admis-
sion on the part of the court the jury would likely reason that
as they were told not to consider it before it was read to them,
so was it necessary to tell them to disregard it before they
were expected to consider it in order to satisfy some unreason-
able and technical rule of law that would hide some of the
truth from the jurors but for the adroitness of the trial judge.

The further claim that this error should be disregarded
because the evidence adduced on the part of the plaintiff did
not establish an express warranty and, hence, it is immaterial
whether there was error committed in the admission of the
testimony bearing upon a breach thereof, need not be consid-
ered, because the defendants did not move at the close of the
trial for a dismissal of the complaint, whereby they in legal

effect consented to the submission of the question to the jury whether there was an express warranty, and thereafter it was not and is not now proper for the defendants to claim that they were entitled to judgment as matter of law. (*Pollock v. Penn. Iron Works Co.*, 157 N. Y. 699 ; *Hopkins* v. *Clark*, 158 N. Y. 299.)

We now come to the last claim put forth in support of the affirmance of the judgment, notwithstanding the error of the court in admitting the evidence, which is : That if there was evidence tending to prove an express warranty, the verdict, being general in favor of the defendants, imported that no contract of warranty existed, and being unanimously affirmed, renders immaterial the erroneous rulings relating to evidence bearing only on the question of the breach of the contract. The difficulty with this proposition is that it assumes that the jury decided that there was no express warranty made. This we may not do. The court submitted to the jury two questions, as to which it instructed them that if they found in favor of the defendants on either question their verdict should be for the defendants. Those questions were (1) Did the contract contain an express warranty by the defendants that the document was typographically produced from movable types ? (2) If the contract contained an express warranty, was there a breach of it ? As the verdict of the jury was general we are not advised whether the jury found in favor of the defendants upon the first or the second question submitted to them ; and in such case it is the duty of an appellate court to reverse the judgment for substantial errors on the part of the court in either receiving or rejecting evidence bearing upon either of the issues submitted to the jury, or for errors of substance in the charge as to either of such issues.

The judgment should be reversed and a new trial granted, with costs to abide the event.

Landon, J.   Concurring with the chief judge, I also think that the argument in behalf of the defendants that if the plaintiff had believed that he had their express warranty that

the ancient letter was genuine, he would not have asked for a letter from Mr. F. S. Ellis to the effect that, in his opinion, it was genuine, loses much of its force when we consider that the opinion of this expert might be of greater value than any warranty could be. For, if the ancient letter was really shown to be genuine, then its value would be established, a value not only considerable in money, but in the mental satisfaction of the purchaser. Mr. F. S. Ellis' letter tended to establish such genuineness, not as a fact, but to the satisfaction of the owner, while the defendants' warranty only promised money damages if the document should prove to be spurious. Hence, there was no inconsistency between insisting upon the warranty and asking for Mr. F. S. Ellis' opinion, and, therefore, that letter was irrelevant to the question of warranty. The letter being hearsay and incompetent upon the real question, but from its very terms being one which the jury would regard as pertinent to it, they would naturally treat the judge's attempt to exclude its contents from their consideration as a perfunctory instruction, given in pursuance of some technical rule, unless the instructions to disregard it should be so clear and explicit as not only to amount to a command but to a fair counterpoise to their natural convictions. If the court had stricken out the letter the case would be clearer, but as it did not, but elsewhere said that every letter received in evidence could be read, it remains doubtful whether they felt bound to disregard the letter. Mr. F. S. Ellis' letter was very important. The plaintiff had testified that he had very great respect for the opinion of that gentleman. After his purchase assaults upon the genuineness of the ancient document shook his faith. He confessed that Mr. F. S. Ellis' favorable opinion would greatly assure him and the defendants procured it. Would not the jury, following the lead of skillful counsel, agree that the plaintiff got what he, in effect, said would satisfy him? If he wanted anything more satisfactory why did he not ask for it? Notwithstanding what the trial judge said, the jury would find it hard to go counter to their own convictions.

As to the warranty, the test of its existence is the impression the defendant Ellis intended to produce, and did produce, by his representations in the mind of the plaintiff as to the positiveness of the defendants' assurance to him that the ancient letter was genuine. The conversation lasted an hour. Mr. Ellis came to it fully prepared. The plaintiff had had no previous notice that he was to be exposed to such solicitation. The result was the plaintiff paid nine hundred pounds for this document. Mr. Ellis thus accomplished his purpose. The evidence of the conversation should be considered in the light of these facts, and probably the jury did so consider it, but the letter of Mr. F. S. Ellis was to the effect that the warranty was not broken, and hence the plaintiff failed to recover.

O'BRIEN, J. (dissenting). The plaintiff's action was for damages upon a breach of an express warranty in the sale of a chattel. The subject-matter of the controversy carries the mind back to events that occurred in the fifteenth century, but the principles of law applicable to the dispute are exceedingly simple and well understood. The plaintiff's statement of his case is this : He alleges that on or about the 21st day of March, 1890, the defendants, a firm of booksellers doing business in London, sold to him a certain book or document, purporting to be a copy of a letter written in the Spanish language by Christopher Columbus on his return from his first voyage and addressed to Luis de Sant Angel, announcing his discovery of the new world. It is alleged that the seller represented and expressly warranted to the plaintiff, the buyer, that this book or document was a printed copy, typographically produced from movable types and not mechanically reproduced by photography, lithography, engraving or other reproductive process ; and that relying upon this express warranty and believing the same to be true, the plaintiff purchased the book or document and paid the defendants therefor the agreed price of nine hundred pounds sterling. It is then alleged that this representation or warranty was not true in point of fact ; that the book or document was not a printed

copy and had not been produced, typographically, by means of movable types, but had been produced in some other way, so as to constitute a counterfeit presentment of a printed book typographically produced. It will be seen that the thing sold was what appeared to be an ancient book or document; that is to say, the letter of Columbus, written in the year 1493, and printed about that time by the methods of printing then in use. The representations alleged to have been made by the seller related to the manner in which the book or document had been produced; that is to say, it is claimed that the assurance was to the buyer that it had been produced by typography or the use of movable types. The warranty, if any, related to the process or means by which the thing offered for sale had been produced, and, consequently, whatever was said by the buyer related to things that transpired four hundred years previously.

The plaintiff was an expert judge of old typography, and had all the knowledge on that subject that the defendants had, and perhaps more. The defendants denied that they ever made any express warranty concerning the book or the process of its production. This issue absorbed the whole controversy, and every other question was subordinate to the fundamental inquiry, whether the parties entered into a contract of express warranty. The warranty in this case, if there was one, is to be deduced from the conversation between the seller and the buyer at the time of the sale. There is nothing in writing that gives us any light on the question. The transaction took place between the plaintiff and Mr. Gilbert I. Ellis, one of the defendants, and who in the transaction represented the firm. The collateral obligation or contract, which sometimes arises upon the sale of chattels, known in law as an express warranty, need not be expressed in any particular form of words. Any affirmation or statement by the seller to the buyer concerning the quality or condition of the thing sold, when stated as a fact and not as matter of opinion, for the purpose of assuring the buyer of the truth of the fact affirmed and inducing him to make the purchase, if so received and

relied upon by the purchaser, is an express warranty. But in such cases the language of the affirmation, the subject of the warranty and the circumstances of the case must be such that the buyer understood, and had the right to understand, that the seller's assurances of quality or condition related to facts and not to mere matters of opinion. If, in this case, the plaintiff knew, or ought to have known, that the statements or representations of the seller, concerning the methods by which the thing offered for sale had been produced, were not statements or representations concerning facts, but, on the contrary, were mere matters of opinion or argument, there was no warranty, express or implied.

The actors in the transaction were the plaintiff and one of the defendants, and the express warranty which the plaintiff claims was made on the occasion of the sale must be deduced from the language employed by the parties at the time the sale was made. The buyer, who is the plaintiff, and the seller were both sworn at the trial, and there is no material difference in their version of what took place. For the purposes of this appeal the plaintiff's version may be considered the correct one. He stated that he purchased the book from the defendants on the twentieth day of March, 1890. He tells us that he had transacted business with the defendants for about twenty years, and that he bought the book, which is the subject of controversy, from Mr. Ellis of the defendants' firm. He says that he had never seen the book before, and that the seller came to his house and said he had brought with him from England a recently discovered copy of the first letter of Columbus announcing the discovery of America, printed in Spanish, which he would like to sell. He told the plaintiff that he had been holding it at two thousand pounds, but not having been able to sell it he would part with it at a lower price, as he was about returning to England and did not wish to take it back with him. It seems that the seller had another book with him which had been published by his firm, and which contained a translation of the letter into English, with critical notes added. This translation was shown to

the plaintiff, with a preface which contained an exact state-
ment of what the book was.　The full force and effect of the
testimony will be best understood by quoting his own words:
" Mr. Ellis, on the 18th day of March, when he called upon
me, produced this book in controversy, which I purchased,
and at the same time the book containing the advertisement
and preface, part of which has just been read.　Further, we
examined the book in dispute, looking at the binding, the
paper, text, and at the same time consulting the preface, Mr.
Ellis calling my attention from time to time to the statements
in the preface, which he repeated and confirmed.　I told Mr.
Ellis I was not acquainted with Spanish typography, and I
called his attention to what I considered the crude and irregular
character of this work.　To that he replied, as he had in his
preface, that that was really an evidence of the genuineness
of the book, as it was just such work as an ordinary typesetter
would turn out if he was in a hurry to print such important
news as the discovery of a new world.　Mr. Ellis said that this ·
was a genuine piece of ancient typography, and he had no
hesitation in making the statement because he had examined
it himself and because he had received the opinions of several
English experts, some of whose names he gave me.　Among
those experts was the name of his uncle, Mr. F. S. Ellis,
formerly the senior of the firm, with whom I had dealings
for twelve or fourteen years, who had been over here, visited
at my house and I had visited him in London, and for whose
opinion as an expert in books I had very great respect."　The
plaintiff says that he did not at that time produce anything
from Mr. F. S. Ellis in the form of an opinion, or from any
other experts.　The plaintiff says that the seller told him
about the crudities in the book, to which reference has been
made; and the seller said that these crudities were evidence of
the genuineness of the book, and that it was a genuine piece
of ancient typography.　The interview was not far from an
hour in duration.　The plaintiff also testified that he examined
the book with the defendant, and consulted the translation
and preface referred to, and that the seller dwelt upon the

importance of the discussion from a literary and historical standpoint, and urged the plaintiff to buy the book as a companion for one that he already had of the same letter printed in Latin, and that if the plaintiff would buy it he would make a very material concession in price. The plaintiff admits that the seller told him that the genuineness of the book was the subject of dispute between experts; that certain experts, which he named, were of the opinion that it was genuine typography, while other experts, which he named, gave opinions to the contrary. The plaintiff kept this book about five years. It seems that about a year after this transaction the plaintiff offered his collection of ancient or rare books for sale and mentioned in the catalogue the fact that the genuineness of this book had been questioned publicly, and added, " From the very nature of things, the facts must always remain matters of conjecture, and dogmatic statements are unjustifiable. The weight of evidence indicates that it is a unique and genuine copy of the absolutely earliest report of Columbus's great discovery." Mr. Ellis, who sold the book to the plaintiff, gave his version of what took place, and the important part of it may be produced in a few words. He tells us that he made this statement to the plaintiff : " ' Before we go any further, I would like to put you in possession of a few facts relating to this book, and, if you don't like what I am going to tell you, I prefer that you say so, and I will take the book away with me and consider this business at an end.' He turned around and said, ' What are you going to say ?' I said, ' Simply this, that I told you what my opinion is about this book, and I thoroughly believe in it, but, at the same time, my opinion is not shared by some other people.' He said, ' Who are they ?' I said, ' The principal person to attack this book is Mr. Quaritch,' and I said, ' I don't to my knowledge, believe that he has ever seen it; I think his opinion is, that it is not genuine, that is to say, I think he is a man who will state a thing of that kind, of this character, which is not his own, and I don't really attach much importance to it.' I told him that Harisse was not inclined to believe in it, but he also had not

seen the book." This part of the testimony of the seller is
not denied by the plaintiff. The plaintiff admitted that when
the seller referred to the opinion of the senior member of the
firm, and the opinions of others which he mentioned, he under-
stood that the seller was all the time giving a reason for his
own opinion as to the genuineness of the book as a piece of
typography. He tells us in substance that he understood
these statements as made by the seller as a reason for and in
support of his own opinion.

The parties gave testimony, pro and con, upon all the issues
in the case, but in regard to the main issue, which was whether
any contract of warranty had been made, the substance of all
the testimony has been given. At the conclusion of the tes-
timony the court submitted the whole case to the jury, and a
general verdict for the defendants was found, which has been
unanimously affirmed at the Appellate Division. On the face
of the pleadings there were three issues of fact in the case :
(1) Whether any warranty was made ; (2) whether, if made,
it had been broken ; (3) the damages for the breach. It will
be seen that the last two questions were entirely subordinate
to the first one. They depend entirely upon the first or funda-
mental proposition in the case. Of course, if no contract of
warranty was made, there was no breach thereof, and there
being no contract and no breach there could be no damages.
The verdict of the jury, therefore, negatives the plaintiff's claim
that the seller warranted the character and quality of the work-
manship of the book, and imports an express finding that no
warranty was ever made. The decision at the Appellate Divis-
ion affirming the judgment is unanimous, and, hence, the find-
ings of the jury upon all the issues are not open to question
in this court. The only questions presented by this appeal
grow out of exceptions taken by the plaintiff's counsel at the
trial. It is scarcely necessary to say that a court of last resort
ought not to reopen a controversy of this character for rea-
sons that are merely fanciful or speculative. Every intend-
ment is to be made in support of a judgment entered upon
the verdict of a jury, and this court has no right to interfere

unless the party appealing has satisfied it that some material or substantial error to his prejudice was committed at the trial. I think that this record does not disclose any such error. None of the exceptions taken to the rulings .of the court at the trial present any question worthy of serious consideration except one, and since the appeal is very largely, if not entirely, founded upon this exception, it is due to the case that it be fairly and fully considered. It appears that on the 13th day of June, 1891, more than a year after the sale of the book in question, the plaintiff addressed a letter to the defendants, in which he suggested that they must have seen the controversy in the New York papers at the time of the sale of his library, in regard to the merits of the Columbus letter, which he had purchased from them. He then proceeded to state that while he had not the slightest doubt as to the genuineness of the book, he was naturally desirous of establishing its authenticity beyond question, if possible ; that unless he was mistaken, the member of the defendants' firm who had sold it to him stated at the time that Mr. Major of the British Museum had seen it and believed it to be what the seller *claimed for it,* and that Mr. F. S. Ellis, formerly the senior member of defendants' firm, for whose judgment he had very great respect, *believed* the book to be genuine. He then proceeded to ask the defendants if it would not be possible for them to procure from these persons " letters stating their opinions as reported to me," and if this could be done it would effectually silence the claim of certain persons whom he named, based upon interested motives, that his copy was not genuine. He added that the persons named who had made hostile reports as to the genuineness of the book had in fact never seen it, and that the seller had so stated to him when he made the purchase. He concluded by stating that it was evident that the attack made upon the genuine character of the book was based upon hearsay evidence. This letter was offered in evidence by the defendants' counsel and received without objection. It was an important and significant piece of evidence, since it not only referred to what had been

*reported* to him at the time of the sale by the seller, but tended to show that the writer was seeking to sustain the genuine character of the book by the opinions of experts, the only way its true character could be known. It was not such a letter as would naturally be written by a business man of great intelligence, himself an expert on the subject, concerning the genuine character of a book which he now claims that he purchased from the defendants a year before upon the faith and security of an express warranty The letter shows that the plaintiff all the time supposed that he had bought something, the genuineness and value of which depended upon its reputation among experts. What followed was simply a compliance by the defendants with the request contained in this letter. On the 30th of June, 1891, seventeen days after the request, Mr. F. S. Ellis, the expert whose opinion the plaintiff sought to obtain, and the person in whose judgment he expressed the greatest confidence, addressed a letter to the defendants, which purports to be a reply to their inquiry in regard to the book made at the request of the plaintiff, in which he stated that after a careful examination of the document, and weighing all the arguments that could be adduced on either side, he had come most decidedly to the conclusion that it was a genuine piece of ancient typography, belonging to the latter part of the fifteenth century; that such was the opinion of other experts whom he named, and that none were more competent to judge of early printing. He concluded by stating that he looked at the work in question without any bias in favor of its being genuine, and that he never had the smallest pecuniary interest in it in any way. This letter was just what the plaintiff wanted and what he had himself applied for. The letter tended to prove at least one fact, and that was that the plaintiff, a year after the sale, was in quest of expert opinions, which were furnished to him, concerning the genuine character of a work which he now claims was covered by an express warranty by perfectly responsible parties. If he actually supposed that he had taken such an obligation from the seller, the query would naturally arise in the

minds of the jury why it was that he was in search of
expert opinions on this question in Europe and elsewhere.
The defendants' counsel offered this letter in evidence. It
was objected to on the ground that it was mere hearsay
and contained an expression of the opinion of the writer
that the book was genuine, which was not a statement under
oath, and, hence, not evidence. Of course, this was a valid
objection, and the court so held and decided. He ruled
explicitly that the letter was not competent proof of any thing
stated in it, that is to say, of any fact or opinion expressed,
but that it could be received for the sole purpose of showing
that the plaintiff's request for the letter had been complied
with. So the effect of the letter as proof was simply to show
that a certain person, at a certain time, sent a letter to another
person on a certain subject, at the express request of the per-
son to whom it was sent, who in this case was the plaintiff.
The defendants' counsel was permitted to read the letter to
the jury, to which the plaintiff's counsel objected, and took
exception. Whatever merit there is in this appeal depends
entirely upon the validity of the exceptions taken to this
letter. I think the exceptions are not valid for various
reasons that appear to me to be conclusive.

1. In the first place it was part of the plaintiff's correspond-
ence in regard to the genuine character of the book, and it all
referred to statements made to him at the time of the sale by
the seller. It was written at the plaintiff's request and had been
in his possession for several years before he made any claim that
he had an express warranty. It proved or tended to prove that
the plaintiff had for years been collecting the opinions of
experts to verify opinions which he said the seller had expressed
at the time of the sale. Why the plaintiff should take the
pains to do all this if it was true, as matter of fact, that he
supposed all the time that he was protected by an express
warranty of responsible parties, is a question that would
naturally suggest itself to any reasonable man. It may be
asserted, but cannot be proved by any fair process of reason-
ing, that the admission of the letter under the limitations and

restrictions imposed by the court was legal error, prejudicial to the plaintiff. The fact that it was read to the jury adds nothing to the point. If it was admissible for any purpose it could be read, otherwise the jury could never know who wrote it, or to whom it was addressed, or the subject to which it related. But the learned trial judge instructed the jury in very plain term to disregard the contents, as it was not proof of any statements or opinions expressed, and for this court to hold, as matter of law, that the minds of the jury, or the verdict, was affected by this letter, when the court instructed them to disregard it, is to discredit the administration of justice through the jury system, and in effect to say that juries are incapable of performing their duties with ordinary intelligence or integrity. Had the letter been received generally, without any restrictions as to its effect as proof, but before the submission of the case to the jury the court had instructed them that it was not competent proof and to disregard it entirely, the error, if any, would have been cured under the decisions of this court. (*Gall* v. *Gall,* 114 N. Y. 109; *Holmes* v. *Moffat,* 120 N. Y. 159; *People* v. *Schooley,* 149 N. Y. 99; *People* v. *Priori,* 164 N. Y. 469.)

The suggestion that the error, if any, was not cured because the judge in his charge did not sufficiently identify the letter, is, I think, hypercritical. The letter was described by the court as one written by Mr. F. S. Ellis, and it was the only letter offered or in the record written by him, and the only letter in regard to the admission of which there was any controversy. The fact that the court also described the letter as written *to* the plaintiff could not mislead any one. In a proper sense it was so written, since the plaintiff applied for it through the defendants' firm, to whom it was delivered, and by them transmitted to the plaintiff, who produced it in court as a part of his correspondence. It is impossible, upon any fair view, to conceive that the jury could not understand what letter it was that the court directed them to disregard. Nor do I assent to the proposition that there was anything in the nature or character of this letter, or of its contents, that differed in

any essential respect from the incompetent proof that was held to be cured by the cases above cited. To say that the jury could not, under the instructions of the court, divest themselves of any impression obtained from this letter, is to create two classes of cases, one in which the error may be cured by the direction of the court, and the other where it cannot. No one suggests where the line of demarkation between the two classes is to be found, and all we can know under such a distinction is that in this case the error could not be cured. It seems to me to be rather an unfortunate distinction.

We are to review the rulings of the trial court and not the verdict of the jury, and it is only by presuming that the jury violated the instructions of the court that error can be predicated upon these exceptions. The plaintiff claimed that he had an express warranty of the workmanship of the book. The defendants had the right to prove any act or admission of the plaintiff that was inconsistent with his claim, and his correspondence with experts had some bearing on that question. The inference to be drawn from the plaintiff's conduct may have been slight, but that goes to the weight and value and not to the competency of the proof. The proposition, therefore, that this letter was inadmissible is not correct in my opinion.

2. But if it be conceded that the letter was incompetent for any purpose, it is plain, I think, that it was immaterial and could not possibly have affected the result. Even if we assume that the jury violated the instructions of the court and considered the letter, all it contained was the opinion of an expert, given a year after the sale, that the book was genuine. This opinion was given at the plaintiff's request and was in accord with his own opinion. The only bearing that the letter could possibly have was upon the question of the genuine character of the book, or, in other words, the breach of the warranty if ever made. This question was dependent upon and subordinate to the primary question, whether there was in fact a contract of express warranty made. The verdict of the jury and the unanimous affirmance negatives that claim,

and, hence, evidence bearing on the minor issues, even though incompetent, is immaterial, since if it had been excluded the result would necessarily be the same. The verdict being general in favor of the defendants and importing that no contract of warranty existed, erroneous rulings with respect to evidence bearing only on the question of damages, or on the breach of a contract never made, become wholly immaterial and cannot be said to have prejudiced the plaintiff. (*Read* v. *Nichols*, 118 N. Y. 224; *Petrie* v. *Petrie*, 126 N. Y. 683.) Since the Constitution and the statute have given to the verdict of a jury upon a question of fact, when unanimously affirmed, such conclusive effect in this court this principle cannot be open to dispute. The conclusion of a jury upon a matter of fact, when confirmed by the unanimous approval of the Appellate Division, imports absolute verity in this court. It cannot be questioned, and a conclusion as to facts not open to debate or question must be the essence of truth. Now truth is such an unbending and adamantine thing that it will not admit of any contradictions, and it is a manifest contradiction in terms to say that while the declaration of the jury in this case that no contract of express warranty was ever made expresses the absolute truth, yet it would be just as true had they found the fact the other way. Such a method of reasoning cannot be admissible since it opens for discussion and review an established truth, which in its nature is final and conclusive. We are forbidden to review or question the evidence upon which the verdict is based, and, hence, unless we violate this prohibition we cannot know judicially that any other conclusion was possible. It is, therefore, idle to speculate and argue in such cases that the jury *might* have found this or that, contrary to the *truth* expressed by the verdict.

3. The only way in which the exception now under consideration can be made debatable is by adopting what appears to me to be a mere fiction, and that is that the jury actually found in favor of the plaintiff upon the main issue that a contract of warranty was made, but at the same time defeated

him on the minor issues in the case as to the breach of the contract or damages. I have already attempted to point out the weakness of this speculation when used as the basis for a reversal of the conclusion of the jury upon the controversy which was submitted to them. But it is very plain, as the learned court below held, that it was legally impossible for the jury to find upon the evidence that a contract of express warranty was ever made or existed, and this proposition, if correct, precludes all speculation as to what the jury did or might have done. The parties were both experts on the subject of typography. Each knew that the other had no personal knowledge concerning the methods used to produce the book in controversy, and in the nature of things could have none. They were talking about a literary production of the fifteenth century, and the material question was whether it had actually been produced by the use of movable types. The solution of the question depended entirely upon the value of evidence derived from history and from the researches and tests of the antiquarian and expert upon subjects of that character. One was as capable as the other of forming a judgment as to the weight and value of the evidence, or as to the strength of the arguments in favor of or against the genuine character of the book. The seller was convinced upon all the evidence that the book was genuine and so expressed himself to the buyer. It is impossible for any reasonable man under such circumstances to arrive at the conclusion that the plaintiff in the transaction believed or supposed or could believe or suppose that the seller was all the time affirming the existence or truth of a fact as a fact, instead of expressing an opinion upon the evidence. The testimony and the nature of the transaction preclude the possibility of any other conclusion than that the seller was expressing opinions and not stating facts as such, and was so understood by the buyer; and, hence, there could be no contract of warranty. An express warranty can be predicated only upon proof of the affirmation by the seller of some material fact, as such, concerning the condition or quality of the thing sold. If the proof conclusively shows, as it does in

this case, that the statements of the seller were mere matters of opinion and were so understood by the buyer, there is no warranty.

It is suggested however that the question whether there was any proof of an express warranty to submit to the jury is not before us for the reason, it is said, that the defendants' counsel admitted that there was such evidence by omitting to move for a nonsuit or the direction of a verdict. It is impossible, I think, for this court to know judicially whether he made any such motion or not, if that is at all important. The verdict was in favor of the defendants, and the plaintiff was the appealing party, and his counsel prepared the case. In preparing it he was entitled to exclude all the exceptions, motions and requests of the defendants, who were the successful parties, and it would be only fair to presume that he exercised that right. The defendants' counsel were not entitled to put these matters into the case by amendment or otherwise, since it was only the exceptions taken in behalf of the plaintiff that could be reviewed. (Code Civ. Pro. § 997.) The plaintiff's counsel in making the case could have inserted a statement showing, affirmatively, that no motion for a nonsuit was made, but in the absence of any such statement this court has no right to assume in his favor a fact which he has not stated in the record, especially for the purpose of reversing a judgment in favor of the opposite party, who had no opportunity, as we have seen, to make the fact appear. To say, under these circumstances, that the defendants' counsel admitted away the fundamental fact in his case is to adopt an unwarranted presumption, not for the purpose of sustaining but of reversing the judgment.

The discussion of a very narrow exception, presenting as it does the only question in the case, has thus led to a review of the whole case, including the effect of a verdict, at greater length than perhaps was necessary. I think there was no legal error committed in the disposition of the case for which this court would be warranted in interfering with the judgment, and it should, therefore, be affirmed.

CULLEN, J. (dissenting).   I think that the evidence was insufficient to make out a warranty, and that for this reason the complaint should have been dismissed on the trial. Entertaining this view, I consider the error in the admission of the letter harmless.   The judgment should be modified so as to give it the same effect as if entered upon a nonsuit, and as modified affirmed, with costs.

GRAY, HAIGHT and WERNER, JJ., concur with PARKER, Ch. J., and LANDON, J.; O'BRIEN, J., reads dissenting opinion, and CULLEN, J., dissenting memorandum.

Judgment reversed, etc.